**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Nov 20 2012, 8:48 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**RUTH A. JOHNSON**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**ANNA K. OBERGFELL**
Wishard Health Services
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE COMMITMENT OF: L.W., | ) | |
| | ) | |
| Respondent-Appellant, | ) | |
| | ) | |
| vs. | ) | No. 49A05-1202-MH-70 |
| | ) | |
| WISHARD HEALTH SERVICES, MIDTOWN COMMUNITY MENTAL HEALTH CENTER, | ) | |
| | ) | |
| Petitioner-Appellee. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Gerald S. Zore, Judge
Cause No. 49D08-0505-MH-20015

**November 20, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

L.W. appeals the continuance of her regular involuntary commitment to Midtown Community Mental Health Center (Midtown), a mental health facility operated by Wishard Health Services (Wishard). Specifically, L.W. contends that the evidence presented at a review hearing for her commitment was insufficient to support the trial court's finding that she is gravely disabled. Finding the evidence to have been sufficient, we affirm.

FACTS

L.W. was first committed to inpatient mental health treatment in 2005 after she had a self-professed "nervous breakdown" after she lost custody of her children to their fathers. Tr. p. 25. At some point, although the regular commitment remained intact, L.W. was discharged from inpatient treatment and received outpatient treatment for a number of years. In June 2010, although L.W. "was repeatedly noncompliant" with her treatment team and frequently asserted that "she wanted to get off her meds," the regular commitment was terminated after a review hearing. Tr. p. 7.

On October 20, 2010, L.W. was again admitted to emergency inpatient mental health treatment after she failed to voluntarily comply with outpatient treatment, including taking her anti-psychotic medication as prescribed. As a result of her noncompliance, L.W. "had hallucinations including visions of God, visions of light, feeling like she[] was walking into the light among other things." Id. at 8. She also "had difficulty functioning at that time outside." Id. After a hearing, L.W. again became subject to a regular commitment order on October 26, 2010.

2

On October 5, 2011, Midtown provided the trial court with a periodic report concerning L.W.'s treatment progress. Based on that report, the trial court continued L.W.'s regular commitment without a hearing on October 11, 2011. On December 7, 2011, L.W. filed a "Motion for Hearing for Review or Dismissal of Regular Commitment," and on January 23, 2012, the trial court held a review hearing. Appellant's App. p. 21-22.

At the review hearing, Dr. Mukesh Desai, a psychiatrist licensed in Indiana with more than thirty years of experience, testified that he had been treating L.W. since November 2010. At that time, although L.W. remained subject to the regular commitment, her treatment was on an outpatient basis.[1] As part of L.W.'s outpatient treatment, a case manager from Midtown would bring L.W.'s medication to her apartment on a daily basis. However, L.W. would sometimes refuse to come to the door and was resistant to taking the oral medications. When L.W. was noncompliant with taking the oral medications, Dr. Desai determined that L.W. would need to be switched to an injectable medication that is given monthly rather than daily. However, L.W. also refused to take the injectable because she is "very terrified of needles." Tr. p. 29.

According to Dr. Desai, L.W. has a mental health diagnosis of "Schizoaffective Disorder, Bipolar Type." Appellant's App. p. 17. However, Dr. Desai testified at the review hearing that L.W. has "extremely poor insight" into her diagnosis and "doesn't accept that she has a psychiatric disorder." Tr. p. 8. Indeed, L.W. testified at the hearing

---

[1] L.W. lives alone in an apartment, and she pays her rent with money she receives from Social Security Disability payments for which her mother is the payee.

that she does not feel that she has a mental illness, but she believes she "need[s] to be on medication for depression, because [she] was raped when she was fifteen, and contracted Herpes." Id. at 22. Based on L.W.'s history of noncompliance and lack of insight into her condition, Dr. Desai testified at the hearing that he believed L.W. would not take her medication without a commitment. More particularly, when Dr. Desai was asked whether he believed L.W. would comply with taking her medication voluntarily if she was afforded the opportunity, he testified:

> I don't think so. Given her history, it has been repeated. And, to [L.W.'s] credit she is extremely persistent every time she comes in. She persist[s] that she doesn't want her medicine. She wants off the injection. [She says she will] take oral medicines, but given the history with the other Act Team, and with us to the other oral medicines, and her medication for the Herpes that she had[,] [s]he was not taking it regularly, and we cannot expect her to comply with taking medicines orally.

Id. at 11.

Dr. Desai also testified that L.W. has a history of abusing marijuana, which "has a strong propensity to promote psychosis" and thus puts L.W. at a greater risk of relapsing into psychiatric symptoms. Tr. p. 9. L.W. admitted to using marijuana within the two months prior to the commitment hearing, but she refused to take a urine screen. At the hearing, L.W. testified that her recent usage was the first time she had used marijuana in three years. However, Dr. Desai testified that L.W.'s use of marijuana had rendered her psychotropic medication ineffective, requiring higher doses of the injectable drug to

4

stabilize her and thus making her more susceptible to side effects from the medication.[2] In addition, although L.W. has been court-ordered to attend substance abuse groups through Midtown, she "refuses" to go. Id. at 10.

According to Dr. Desai, L.W.'s use of marijuana has also led to L.W. reporting that "she wanted to cut herself in a particular area of her body, because she felt that nobody was helping her, and she had a lesion there, and it needed to be taken care of." Tr. p. 9. Because L.W. had previously been diagnosed with herpes, it was possible that she had a lesion on her genitalia as she refused to take her prescribed medication for that illness. However, Dr. Desai testified that no lesion was present on L.W.'s body when she admitted to having these thoughts, and even if there had been, "cutting wouldn't have been a treatment for that" and would have been "a very, very risky thing to even consider doing." Id. Dr. Desai testified that this type of distorted thinking and judgment would be indicative of the thought processes present in those who have L.W.'s mental illness.

Dr. Desai testified at the review hearing that although he did not believe L.W. was "currently" gravely disabled or "at risk to coming to harm," he stated that "without medication she will be." Id. at 10, 11. He further stated that he feared that if L.W.'s commitment were released, she would "resort to erratic behaviors, and that includes possibly hurting herself, or someone else under the influence of the housing agency that

---

[2] L.W. has experienced some pretty significant side effects from her medications, including weight gain, amenorrhea (cessation of one's menses), and galactorrhea (milky secretion from one's breasts). Dr. Desai reported she also complained of loss of appetite, a symptom which he felt was not supported because of L.W.'s weight gain, and a lump in her side, which a nurse could not feel. At the hearing, L.W. further asserted that he had experienced heart pains, which Dr. Desai said she had not previously reported, and vision troubles, which Dr. Desai could not recall whether L.W. had previously reported.

she is at, or the beliefs like the one about the lesions in the genital area that she was concerned about." Id. at 12. In addition, although Dr. Desai recognized that L.W. was currently able to perform all of her activities of daily living, partially because she was getting the injectable medication under the current commitment, he stated that "[t]he lack of awareness of her illness will basically lead to her stopping her medications pretty quickly, and not participating in her treatment, which in turn will lead to a relapse within the next 2 or 3 months." Id. at 14.

At the conclusion of the review hearing, the trial court continued L.W.'s regular commitment and ordered a periodic review to take place no later than January 23, 2013. L.W. now appeals.

DISCUSSION AND DECISION

L.W. claims that the trial court erred in continuing her regular commitment because there was insufficient evidence to show that she was gravely disabled. More particularly, L.W. contends that there was insufficient evidence to support the trial court's order because Dr. Desai testified that L.W. is "not currently gravely disabled" and only expressed a fear that L.W. would become gravely disabled "at some future time . . . if she did not take her medications." Appellant's Br. p. 3.

Civil commitment is a significant deprivation of liberty that requires due process protections. In re Involuntary Commitment of A.M., 959 N.E.2d 832, 835 (Ind. Ct. App. 2011) (citing Addington v. Texas, 441 U.S. 418, 427 (1979)). In Indiana, a trial court may only order the regular involuntary commitment of an individual if, after a hearing,

6

the court finds by clear and convincing evidence that the individual is: (1) mentally ill; and (2) either dangerous or gravely disabled. Ind. Code § 12-26-7-5.

When reviewing whether an involuntary commitment is supported by the evidence, we consider only the evidence favorable to the judgment and all reasonable inferences from that evidence. Heald v. Blank, 785 N.E.2d 605, 613 (Ind. Ct. App. 2003). We do not reweigh the evidence or judge the credibility of witnesses. Golub v. Giles, 814 N.E.2d 1034, 1038 (Ind. Ct. App. 2004). If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, the order must be affirmed even if other reasonable conclusions are possible. Id.

L.W. does not challenge the trial court's finding that she suffers from a mental illness, and there was no finding that L.W. was dangerous to herself or others. L.W.'s claim on appeal is thus limited to her assertion that the evidence failed to show that she was gravely disabled at the time of the review hearing. Indiana Code section 12-7-2-96 defines "gravely disabled" as:

> a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
>
> (1) is unable to provide for that individual's food, clothing, or other essential human needs; or
>
> (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

We first note that because this definition is written in the disjunctive, the trial court's finding that L.W. is gravely disabled survives if we find that there was sufficient

7

evidence to prove either that L.W. is unable to provide for her basic needs or that her judgment, reasoning, or behavior is so impaired or deteriorated that it results in her inability to function independently. See T.A. v. Wishard Health Serv., 950 N.E.2d 1266, 1271 n.2 (Ind. Ct. App. 2011).

Here, the evidence demonstrates that L.W. suffers from schizoaffective disorder, bipolar type, which causes L.W. to have distorted thoughts and judgment, as evidenced by L.W.'s hallucinations and visions of light at the time of her most recent emergency inpatient admission as well as by L.W.'s admission that she wanted to cut herself to treat a non-existent lesion. Tr. p. 8-10. L.W.'s lack of insight into her condition and her refusal to take medications that can alleviate her psychotic symptoms are further evidence of L.W.'s impaired judgment. Id. at 7-8, 11, 22. Finally, L.W.'s impaired judgment is shown by her use of drugs that render her medications ineffective, thus requiring larger doses and subjecting L.W. to harsher side effects. Id. at 9-10, 13.

Despite this evidence, L.W. points to Dr. Desai's testimony that L.W. was not "currently" gravely disabled and argues that the trial court therefore had no basis to find that she was gravely disabled at the time of the review hearing. Appellant's Br. p. 7; Tr. p. 10, 36. However, L.W.'s argument asks us to reweigh the evidence and fails to take into consideration that her stability at that time was due, at least in part, to the forced medications she was receiving under the regular commitment. Indeed, this Court has upheld commitments in the past where a treating physician has testified that, due to an

8

existing forced medication order, an individual was "not currently gravely disabled." J.S. v. Ctr. for Behavioral Health, 846 N.E.2d 1106, 1113 (Ind. Ct. App. 2006).

In J.S., a psychiatrist testified that J.S. did not believe she was mentally ill, was resistant to taking her antipsychotic medications, and had been repeatedly hospitalized for paranoid delusions after failing to take her medications. Id. at 1112. The psychiatrist also testified that "in the absence of a commitment . . . [J.S.] will inevitably discontinue treatment and decompensate resulting in her grave disability." Id. at 1113. Like the situation presented here, the testimony regarding J.S.'s condition was heard at a review hearing when J.S. was already subject to a regular involuntary commitment. Id. at 1109. Based on this evidence, the J.S. Court determined that there was sufficient evidence to support the trial court's finding that J.S. was in fact gravely disabled. Id. at 1113.

Similarly, L.W. does not believe she is mentally ill, and she has "extremely poor insight" into her diagnosis. Tr. p. 8, 22. Dr. Desai testified that he believed that L.W. would possibly harm herself or others if she stopped her medication, which he predicted she would do "pretty quickly," leading to a "relapse within the next 2 or 3 months." Id. at 12, 14. And indeed, L.W. has demonstrated a pattern of noncompliance with taking her prescribed medication even while subject to the regular commitment. Id. at 7, 11, 13, 22. L.W.'s claim that she will comply with taking oral medications if she does not have to take the injectable medication is, again, merely a request to reweigh the evidence, which we may not do. L.W. was previously given a chance to voluntarily participate in outpatient treatment, but she failed to take her medications as prescribed and required

9

emergency inpatient mental health treatment only four months after her prior commitment was terminated. <u>Id.</u> at 7. Thus, like in <u>J.S.</u> and contrary to L.W.'s assertions, Dr. Desai's prediction that she would refuse to comply with taking her medications absent a commitment and would therefore become gravely disabled in the future was not mere speculation.

Taken together, the evidence is more than sufficient to prove that L.W., as a result of her mental illness, is in danger of coming to harm because she has a substantial impairment in her judgment, reasoning, or behavior that results in her inability to function independently. Thus, the trial court properly ordered L.W.'s involuntary commitment to Midtown to continue.

The judgment of the trial court is affirmed.

ROBB, C.J., and BRADFORD, J., concur.