**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Aug 11 2014, 10:40 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**SHANNON L. ROBINSON**
Shannon Robinson Law
Bloomington, Indiana

ATTORNEYS FOR APPELLEES:

**JAMES L. WHITLATCH**
**KATHRYN DEWEESE**
Bunger & Robertson
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE COMMITMENT OF E.L., | ) ) ) |
| E.L., | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) )  No. 53A01-1402-MH-66 |
| INDIANA UNIVERSITY HEALTH BLOOMINGTON HOSPITAL and CAREY MAYER, M.D., | ) ) ) ) |
| Appellees-Petitioners. | ) ) |

APPEAL FROM THE MONROE CIRCUIT COURT
The Honorable Stephen R. Galvin, Judge
Cause No. 53C07-1401-MH-15

**August 11, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MAY, Judge**

E.L. appeals her involuntary mental health commitment, the order for forced medication, and the order that she be transported from a hospital in Bloomington to Richmond State Hospital. She asserts multiple issues on appeal which we consolidate and restate as:

1. Whether there is sufficient evidence E.L. was a danger to herself or gravely disabled as to permit an involuntary mental health commitment;

2. Whether the trial court erred in issuing an order for forced medication; and

3. Whether the trial court erred in issuing the order to transport.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On January 14, 2014, Ashley Risk, a health officer at Indiana University Health Bloomington ("IU Health"), filed an Application for Emergency Detention of E.L. Risk believed E.L. was suffering from bipolar disorder and was a danger to others because she did not "consistently take her medications. She is labile[1] and very disruptive and cannot be handled in the community." (App. at 8) (footnote added). Risk believed if E.L. was not restrained, she would "continue to not take her medications for her Bipolar disorder, potentially increasing her mania. When she is not on her medications she is prone to threatening and erratic behavior and excessive spending." (*Id.*) Risk's application was

_____

[1] Labile means "readily or continually undergoing chemical, physical, or biological change or breakdown: unstable." Merriam-Webster.com, http://www.merriam-webster.com/dictionary/labile (last visited July 11, 2014).

2

accompanied by a Physician's Emergency Statement prepared by Dr. Perry Griffith. Dr. Griffith wrote about E.L:

> She is a Bipolar-Manic patient. She is a Manic patient who does not take medications and becomes very disruptive/labile and unable to be handled in the community. She will not take medications on a consistent basis.

(*Id.* at 9.) E.L was then admitted to IU Health for emergency detention.

The next day, Dr. Carey Mayer of IU Health examined E.L. and diagnosed her as having "Bipolar I Disorder." (*Id.* at 11.) He also found she was "gravely disabled and requires continuing care and treatment," and he recommended she "be detained in this facility pending the hearing." (*Id.*)

Later that day, Risk filed a Petition for Involuntary Commitment that stated E.L. was suffering from an addiction to narcotics or dangerous drugs in addition to her mental illness. Risk added that E.L "is in danger of coming to harm because of her inability to provide for food, clothing, shelter, or other essential human needs." (*Id.* at 14.) Risk wrote that E.L. "exhibits very erratic behavior and poor judgment." (*Id.*)

The Physician's Statement attached to that Petition for Involuntary Commitment was by Dr. Mayer, who stated E.L.'s disorder and addiction to narcotics or dangerous drugs disturbed her "thinking, feeling or behavior and impairs her ability to function. Specifically: Very manic beh[avior] and symptoms including bizarre behaviors, and poor judgement [sic]." (*Id.* at 15.) Dr. Mayer opined E.L. was in need of care for which outpatient treatment would not be adequate. He noted that obtaining treatment on a voluntary basis was not appropriate because E.L. "[d]emonstrated poor compliance[.]"

3

(*Id.* at 16.) He indicated suitable facilities for her care, treatment and protection were Centerstone Community Mental Health Center, Bloomington Hospital, and Psychiatric State Hospitals, with Centerstone being the least restrictive environment. He opined that E.L.'s treatment needed to be a "2 Year Regular Commitment[.]" (*Id.* at 17.)

On January 20, E.L. filed a response to the petition, arguing commitment was unnecessary. She indicated she voluntarily sought treatment at both IU Health and Centerstone and she asserted she had post-traumatic stress disorder, chronic depression, and anxiety. She denied having bipolar disorder, being addicted to narcotics, or exhibiting manic behaviors. She also alleged she provided for herself and took all her medications.

The trial court held a hearing on the petition on January 21. At the hearing, Dr. Mayer sought a forced medication order to administer Invega Sustenna, Zyprexa, and Abilify Maintaina, stating they were all from the same class of medications and their risks are outweighed by their benefits. Dr. Mayer testified Centerstone transferred E.L.'s treatment because she did not show up several months for her injection of Invega Sustenna, a medication for Bipolar Disorder. He stated E.L.'s January admission was her third hospitalization in four months and she was manic during her admissions to IU Health. Dr. Mayer revealed E.L. threatened Risk with physical assault prior to the hearing. In addition, he believed E.L. was falsifying court documents, and she had stopped in the middle of the street to yell at people while driving around IU Health. He

4

testified: "At this time I think it's in her best interest to go to a state hospital and finally get this bipolar manic state treated." (Tr. at 13.)

That same day, the trial court entered a commitment order in which it found E.L had bipolar disorder, was dangerous to herself and others, and was gravely disabled. The order stated IU Health was the appropriate and least restrictive facility for the necessary care but, given the short-term stay allowed at IU Health, E.L. could be transferred to a state institution for further treatment if necessary. It ordered E.L. to be forcibly medicated.

On February 11, Centerstone wrote a letter to the trial court indicating E.L.'s mental status had deteriorated and she needed to be transferred from IU Health to Richmond State Hospital for long-term care. Centerstone requested a Transport Order for February 17. E.L. filed a motion to reconsider, claiming she had made progress at IU Health, Dr. Mayer was to discharge her on February 12, and Centerstone had no direct knowledge of her current mental status. E.L. was transported to Richmond.

On February 21, the trial court held a hearing on E.L.'s motion to reconsider. At the hearing the court ordered Centerstone, IU Health, and Richmond State Hospital to communicate and ensure there was an appropriate treatment plan for E.L. Because the three health care providers could not agree on a treatment plan, on March 13, the trial court ordered E.L.'s case dismissed and E.L. released from Richmond State Hospital.

**DISCUSSION AND DECISION**

As E.L.'s commitment has been dismissed, this matter is moot. Generally, we dismiss cases that are moot, but a moot case may be decided on the merits when it involves questions of great public interest that are likely to recur. *Golub v. Giles*, 814 N.E.2d 1034, 1036 n.1 (Ind. Ct. App. 2004), *trans. denied*. "The question of how persons subject to involuntary commitment are treated by our trial courts is one of great importance to society[,]" therefore, we will address the merits of this case. *See id.*

When reviewing a challenge to sufficiency of the evidence with respect to commitment proceedings, we must review the evidence in a light most favorable to the trial court's decision and draw all reasonable inferences from that evidence. *J.S. v. Ctr. for Behavioral Health*, 846 N.E.2d 1106, 1111 (Ind. Ct. App. 2006), *trans. denied*. If a commitment order represents a conclusion that a reasonable person could have drawn, we will affirm the order, even if other reasonable conclusions are possible. *Id.* We will not reweigh the evidence or judge the credibility of the witnesses. *Golub*, 814 N.E.2d at 1038.

### 1. Involuntary Mental Health Commitment

To demonstrate that a person should be involuntarily committed, the petitioner must prove by clear and convincing evidence that (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of the individual is appropriate. Ind. Code § 12-26-2-5(e). On that showing, the court may order involuntary commitment for a period expected to exceed ninety days. Ind. Code § 12-26-

6

7-1. E.L. is challenging the trial court's finding that she was either dangerous or gravely disabled.[2]

"Gravely disabled" in this context means a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:

> (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

Ind. Code § 12-7-2-96. E.L. argues that she is able to provide food, clothing, shelter, and essential needs, but the court could find she was gravely disabled without finding she was incapable of providing those needs for herself. *See id.*

E.L. had been hospitalized at IU Health in October 2013, November 2013, and January 2014. Dr. Mayer believed E.L. did not take her medications and did not seek treatment for her bipolar disorder. He noted E.L acted manic during her recent hospital admissions, demonstrated poor judgment, and exhibited bizarre behaviors. E.L. was frequently angry and threatening, and according to testimony, she threatened Risk with physical assault. On multiple occasions, people saw her in the streets around the hospital yelling at others. In addition to her physical actions, E.L. told Dr. Mayer that she bought many new things, such as three houses and a new car, but her only income was social security. The evidence supports the trial court's determination that E.L. had a substantial impairment of judgment, such that her ability to function independently was

---

[2] E.L. does not challenge the determination of her mental illness or the appropriateness of her commitment.

7

compromised. *See Golub*, 814 N.E.2d at 1039 (history of hospitalizations and deterioration of behavior was sufficient to demonstrate Golub was gravely disabled).[3]

2. Forced Medication Order

A patient has the right to refuse treatment, and in order to override the right, a petitioner must demonstrate by clear and convincing evidence that:

> 1) a current and individual medical assessment of the patient's condition has been made; 2) that it resulted in the honest belief of the psychiatrist that the medications will be of substantial benefit in treating the condition suffered, and not just in controlling the behavior of the individual; 3) and that the probable benefits from the proposed treatment outweigh the risk of harm to, and personal concerns of, the patient.

*In re Mental Commitment of M.P.*, 518 N.E.2d 645, 647 (Ind. 1987). In addition, the order must limit the time period within which the medications may be administered. *Id.* at 648.

Dr. Mayer made an individual assessment of E.L. and diagnosed her with bipolar disorder. He requested she be treated on an on-going basis with Invega Sustenna and Abilify Maintena, and the court order immediate-release Zyprexa for use only in the event E.L. became too agitated and out of control. According to Dr. Mayer's testimony, the risks of these medications are extremely low and the risks are greatly outweighed by the benefits. He noted these medications were to "aggress and align chemical difficulties

---

[3] E.L. also argues she is not dangerous. We need not address that matter, as we affirm based on the trial court's finding that she is gravely disabled. *See A.L. v. Wishard Hosp. Servs., Midtown Cmty. Mental Health Ctr.*, 934 N.E.2d 755, 762 (Ind. Ct. App. 2010) (holding because Ind. Code § 12-26-6-1 is written in the disjunctive, proof of either being dangerous or gravely disabled is enough to justify involuntary commitment).

that we feel are responsible for bipolar disorder." (Tr. at 9.) Thus, the medications were intended not only to decrease E.L.'s symptoms, but also to have a positive impact on her condition. He suggested the time limit for the administration of these medications be the two-year commitment. That is sufficient evidence to permit a forced medication order. *See In re Mental Commitment of M.P.*, 518 N.E.2d at 647-48 (stating the requirements needed to override the right to refuse treatment).

### 3. Order to Transport

E.L. asserts Centerstone was not her "gatekeeper" under Ind. Code § 12-24-12-10, and therefore could not request transport. Her argument is misplaced because she relies on article 12-24 of the Indiana Code, which pertains to "State Institutions." IU Health is not a state institution listed in Ind. Code § 12-7-2-184.

E.L. was committed to IU Health pursuant to Ind. Code art. 12-26, which outlines procedures for "Voluntary and Involuntary Treatment of Mentally Ill Individuals." Chapter 11 governs the transfer of an individual and provides an individual committed under Ind. Code art. 12-26 may be transferred to a community mental health center or to a state institution. Ind. Code § 12-26-11-1. A community mental health center may decline to admit an individual being transferred, if certain conditions are met. Ind. Code § 12-26-11-2. If an individual is transferred to a substantially more restrictive environment, an administrative hearing must be held within ten days after the transfer. Ind. Code § 12-26-11-5.

9

E.L. does not argue IU Health, Centerstone, and the trial court did not follow the procedure outlined in Ind. Code § 12-26-11. IU Health would have ordered E.L. to seek outpatient care at Centerstone, as it is the community mental health center in the area. However, Centerstone declined to admit E.L. based on the difficulty it had had treating E.L. in the past, and Centerstone informed the court E.L. should be transferred to Richmond State Hospital. On February 12, 2014, based on Centerstone's request, the trial court ordered E.L. transported to Richmond State Hospital, and the court held a hearing within ten days to review that transport. *See* Ind. Code § 12-26-11-5 (stating a court must hold a hearing within ten days of a patient's transfer to a more restrictive state institution). E.L. has not demonstrated error in the trial court's order to transport her to Richmond State Hospital.

## CONCLUSION

The evidence is sufficient to support E.L.'s involuntary mental health commitment and forced medication order, and E.L. has not demonstrated error in the procedure by which she was transported to Richmond. Accordingly, we affirm.

Affirmed.

KIRSCH, J., and BAILEY, J, concur.

10